**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

RAMON LABOY-IRIZARRY, MARIA INES
ACOSTA-IRIZARRY and JOSUE RAMON
LABOY-ACOSTA,

    **Plaintiffs**

          v.

HOSPITAL COMUNITARIO BUEN
SAMARITANO, INC., et al.,

    **Defendants**

**CIVIL NO.** 17-1362 (RAM)

**OPINION AND ORDER**

RAÚL M. ARIAS-MARXUACH, District Judge

**I. BACKGROUND**

Plaintiffs Ramon Laboy-Irizarry ("Mr. Laboy"), Maria Ines Acosta-Irizarry ("Mrs. Acosta") and Josue Ramon Laboy-Acosta ("Mr. Laboy-Acosta") are respectively the father, mother and brother of Ileana Laboy-Acosta ("Ileana"). On March 15, 2017, they filed this action seeking damages arising from alleged medical malpractice. Specifically, Plaintiffs contend that Ileana's death due to post-partum hemorrhaging after giving birth to her second child at Hospital Comunitario Buen Samaritano, Inc. ("the Hospital") was the result of medical malpractice. To recover their damages, Plaintiffs sued the Hospital, four (4) doctors who provided care

to Ileana, the doctors' spouses and the conjugal partnerships between said doctors and their spouses.

Dr. Castillo was Ileana's Obstetrician and Gynecologist and had delivered her first child. Dr. Marrero was the anesthesiologist who provided care to Ileana on the day of her death. Dr. Rivera was an emergency room doctor who briefly provided care to Ileana shortly after childbirth. Dr. Samuel Fuentes provided care to Ileana while she was at the Hospital's Intensive Care Unit.

On June 20, 2019, this case was transferred to the undersigned. At the time of transfer, a jury trial setting of June 26, 2019 was in effect. The Court modified the schedule to provide for a settlement conference before a Magistrate Judge on June 25, 2019; a final pretrial conference on June 27, 2019; and both jury selection and the first day of the jury trial on June 28, 2019. At the settlement conference with the Magistrate Judge, co-defendants Dr. Castillo, Dr. Marrero, and the Hospital, reached a settlement agreement in which plaintiffs released them from liability. This settlement agreement applies to the present case as well as a related action before the Court of First Instance, Aguadilla Superior Part ("the State Action").

Following the final pretrial conference on June 27, 2019, co-defendant Dr. Rivera reached a settlement agreement with Plaintiffs which also covered this case and the State Action. Accordingly, partial judgments of dismissal **with prejudice** were

entered. Thus, the sole defendant remaining was Dr. Fuentes, who is in default.

Dr. Fuentes was personally served with process and copy of the original complaint on April 7, 2017. Default was entered against Dr. Fuentes on December 7, 2017.

The Court held hearings under Fed. R. Civ. P 55(b) regarding the claims against Dr. Fuentes on June 28 and July 1, 2019. During the hearing held on June 28, 2019, Plaintiffs testified as to the effect Ileana's death had on them. At the hearing on July 1, 2019, Plaintiffs presented the testimony of their medical expert Dr. Jason S. James ("Dr. James"), who testified as to Dr. Fuentes', and the settling co-defendants', breaches of the applicable standard of care and their role in causing Ileana's death.

## II. FINDINGS OF FACT

### A. Background:

1.    Plaintiffs Ramon Laboy-Irizarry, his wife Maria Ines Acosta-Irizarry and their son Josue Ramon Laboy-Acosta are the parents and brother, respectively, of deceased Ileana Laboy-Acosta.

2.    Mr. Laboy and Mrs. Acosta have been married for thirty-six (36) years. They had three (3) daughters and one son, Josue Laboy-Irizarry.

3.    Ileana was the youngest daughter. Her husband was named Zuriel Villarrubia Ruiz. They had two (2) sons. The oldest is Dylan

who is eight (8) years old. The youngest is Elian who was born on the day of Ileana's passing.

4. Ileana was twenty-eight (28) years old at the time of her passing.

5. Following Ileana's passing, Mr. Laboy and Mrs. Acosta moved to Gillette, Wyoming to be close to their son Josue.

6. Defendant Dr. Samuel Fuentes is a medical doctor specialized in emergency medicine.

7. Hospital Comunitario Buen Samaritano, Inc. is a non-profit corporation organized and existing under the laws of the Commonwealth of Puerto Rico which has its principal place of business in Puerto Rico and which is the owner and/or operator of a hospital of the same name, located in Aguadilla, Puerto Rico.

8. Dr. Ruben Castillo is a medical doctor, specializing in obstetrics and gynecology, married to codefendant Jane Doe and together with her constituting a conjugal partnership, who provided medical treatment to Ileana, now deceased.

9. Dr. José Marrero is an anesthesiologist who provided medical treatment to Ileana. Dr. Marrero and his wife are domiciled in Puerto Rico, where they reside.

10.    Dr. Luis Rivera is a medical doctor specializing in emergency medicine who provided medical treatment to Ileana. Dr. Rivera-Rivera and his wife are domiciled in Puerto Rico, where they reside.

**B. As to Ms. Ileana Laboy-Acosta**

11.  Ileana was a twenty-eight (28) year old female with a history of a prior vaginal delivery in 2011 of an 8-pound 11-ounce boy delivered by Dr. Castillo.

12.  Ileana's previous pregnancy was complicated by gestational diabetes.

13.  Her medical history is significant for chronic hypertension, for which she took Enalapril 2.5 mg daily.

14.  Ileana had a baseline weight of 199 pounds, reported allergy to aspirin and she began prenatal care with Dr. Castillo at 7.3 weeks gestation, on October 19, 2015.

15.  Her estimated due date was June 3, 2016.

16.  Her prenatal course is significant for an ER visit in December 2015 due to chest pains.

17.  She was found to have elevated blood pressure (135/95) and her obstetrician started her on Apresoline 25 mg twice a daily.

18.  In addition, on February 10, 2016 she was diagnosed with gestational diabetes via three-hour glucose tolerance test and was prescribed a 2000 calorie per day diabetic diet.

19.  She had a total weight gain of eight (8) pounds and her Group B streptococcus ("GBS") status was negative.

20.  According to the Hospital record, Ileana was evaluated on May 25, 2016 and scheduled for induction of labor on May 31, 2016.

**C.   As to the care provided to Ileana on May 31, 2016.**

21.   The admission records reflect that Ileana ("the patient") arrived at the Hospital on May 31, 2016 at 6:40 a.m. for admission.

22.   She was noted to be 39.4 weeks gestation with a temperature of 37.2 degrees Celsius, pulse at 117, respiratory rate of 19, blood pressure 126/83, and weight of 207 pounds.

23.   On admission, her CBC is reported as: WBC 14.09, Hemoglobin 13.30, Hematocrit 38.40, and Platelets 290. Urinalysis findings: clarity (cloudy), glucose (1,000), WBC (26-50), blood (25), epithelial cells (many) and bacteria (many). The records reflect that the patient had intact membranes, and her pain level was 0.

24.   At 7:00 a.m., the nurse's notes document that the fetal heart rate was 130-140 bpm, reactive, with moderate variability and mild irregular contractions without vaginal bleeding and no complaints of pain.

25.   At 7:30 a.m., the nurse documented that medications were administered according to medical order and she was given the first dose of Cytotec at this time.

26.   The second dose of Cytotec was administered at 11:30 a.m.

27.   The chart reflects that at 1:37 p.m., Dr. Castillo arrived to evaluate the patient.

28.  He proceeded to rupture the patient's membranes, and the amniotic fluid is documented to be clear and moderate in amount.

29.  At 2:30 p.m., the patient was examined again by Dr. Castillo and was found to be dilated 4 cm.

30.  At 3:00 p.m. the patient began to vomit.

31.  At 3:15 p.m. the patient was examined by the nurse and was found to be 8-9 cm dilated, 100% effaced, +2 station.

32.  At 3:20 p.m., this was reported to Dr. Castillo via speakerphone due to the fact that Dr. Castillo was in a surgical procedure.

33.  Dr. Castillo replied that as soon as he finished his procedure, he would come to the labor room.

34.  At 3:25 p.m., Mrs. Figueroa (the supervisor) was called and informed of the patient's status and that Dr. Castillo was not immediately available.

35.  Mrs. Figueroa replied that she would come immediately.

36.  At 3:30 p.m., a fetal heart rate of 70-90 bpm was documented.

37.  At 3:35 p.m., the nurse administered oxygen at 2 liters per minute.

38.  At 3:55 p.m., a fetal heart rate of 60-70 bpm was documented.

39.  At 4:17 p.m., the baby's head was observed to have delivered to the level of the neck.

40.   An umbilical cord loop was observed around the neck, extremely tight to the point that the nurse could barely detect any blood in the umbilical cord.

41.   The nurse documents positioning the patient using the Mc Roberts maneuver to favor descent of the shoulder.

42.   The nurse clamped the umbilical cord twice and cut it.

43.   The application of suprapubic pressure to achieve expulsion of the baby is documented, with delivery of the anterior shoulder followed by the remainder of the body.

44.   At 4:20 p.m., the placenta was expelled completely, using the Schultz method, and the nurse administered intravenous fluids of Lactated Ringers solution (1000 ml with 20 units of Pitocin) at 125 cc/hour per orders.

45.   The nurse began a uterine massage due to the presence of profuse vaginal bleeding.

46.   At 4:24 p.m., Dr. Rivera, an emergency room physician, arrived to evaluate the patient and it was noted that the patient continues to experience profuse vaginal bleeding.

47.   The nurse administered Methergine 0.2 mg IM per Dr. Rivera's verbal order and the intravenous fluids were opened to full drip. The patient was oriented about the treatment and she referred to understand.

48.   At 4:55 p.m., the patient was evaluated by her obstetrician, Dr. Castillo, who ordered the nurse to administer a

second dose of Methergine 0.2 mg IM. The patient was oriented about the purpose of the treatment and she referred to understand.

49.   At 4:58 p.m., the patient was transferred to the operating room for an examination under anesthesia as the patient continued to bleed profusely.

50.   The operative report reflects the following: start time – 5:40 p.m.; end time – 7:50 p.m.; preoperative diagnosis-postpartum vaginal bleeding; postoperative diagnosis – uterine atony, left paratubal cyst; procedure – subtotal abdominal hysterectomy, left paratubal cystectomy; estimated blood loss – 1000 ml; complications – none; operative findings – cervix without laceration, no vaginal laceration seen, uterine bleeding continues even with oxytocin drip, postpartum uterus not involuted- atony.

51.   The operative report documents that the round, broad and utero-ovarian ligaments were clamped, cauterized, and cut, as were the uterine arteries.

52.   The uterus was cut at the low segment and sutured in two layers; additional hemostasis was performed with additional sutures; no bleeding was seen, and abdomen closed by layers; estimated blood loss was 1000 cc at the end of the procedure.

53.   An estimated blood loss of 500 cc was noted in the delivery note written by Dr. Castillo at 8:50 p.m.

54.   A nursing note issued at 7:00 p.m. documents the blood transfusions (three (3) units of packed red blood cells) that the patient received, stable vital signs, and mild vaginal bleeding.

55.   A "late note" added to this note documented that Dr. Castillo has been notified that the patient continued to bleed and that he placed some sutures in the vaginal area but that she continued to bleed.

56.   It was documented that three (3) units of PRBC ("packed red blood cells") were administered in OR.

57.   The nurse's operative notes indicated that the patient was transferred to the ICU at 8:20 p.m.

58.   Documentation by Dr. Marrero after the operative procedure indicated that the patient was to be transferred to the ICU in critical condition, intubated and ventilated by Ambu-bag, and vital signs were blood pressure 90/60 and pulse at 110.

59.   According to the ICU director, Dr. Luis Rivera-Carpio, he was called at around 8:30 p.m. in consultation for admission of the patient due to acute blood loss from uterine atony.

60.   At 8:35 p.m., the patient was received from the OR, connected to a mechanical ventilator. The patient's skin was cold to the touch, pale, no capillary refill in either hand, bluish coloration and documented light vaginal bleeding.

61.   A note by Dr. Rivera-Carpio reflected that the medical intern notified him that upon arrival in the ICU, the patient was

unstable, acutely ill, with blood pressure at 51/40 and pulse at 116.

62.  Dr. Rivera-Carpio instructed aggressive fluid management and blood transfusions.

63.  After 8:35 p.m., the temperature of the patient was not measurable.

64.  The patient was placed in Trendelenburg position and a thermal blanket was placed.

65.  Dr. Fuentes consulted Dr. Rivera-Carpio by telephone after the patient's arrival at the ICU.

66.  The Patient's blood pressure was 51/40. Her pulse was 116 beats per minute and could be palpated.

67.  When Dr. Rivera-Carpio arrived at the hospital at approximately 9:10 p.m., the patient had been in cardiorespiratory arrest for 10 minutes, with the cardiac monitor demonstrating pulseless electric activity (PEA).

68.  At 9:28 p.m., a neurology evaluation was performed in the company of Dr. Fuentes. The patient presented pupils reactive to light, reduced corneal reflex, absent gag, no response to verbal stimulation, no response to pain and involuntary movements are observed.

69.  At 9:33 p.m., the ACLS protocol was started and medications were administered per medical order.

70.  A full drip unit was transfused per medical order.

71.   ACLS protocols were continued with participation by the anesthesiologist for a total of 35 minutes with no response.

72.   The patient was pronounced dead by Dr. Rivera-Carpio at 10:20 p.m.

73.   The pathology report states that Mrs. Laboy "had uterine atony producing acute blood loss."

74.   The pathology report demonstrates the uterus weighing 1125 grams, postpartum uterus with decidualized endometrium and placental implantation site; leiomyoma (x7), intramural subserosal, with hyaline degeneration; paratubal left cyst.

**D. As to the Expert Testimony:**

75.   At the hearing, plaintiffs presented the testimony of Dr. Jason S. James.

76.   Dr. James is Board certified in Obstetrics and Gynecology since January of 2006.

77.   Dr. James is a Fellow of the American Congress of Obstetricians and Gynecologists since May of 2006.

78.   Dr. James holds a Medical Doctor Degree from the University of Miami.

79.   He did his medical residency in Gynecology and Obstetrics at the Long Island Jewish Medical Center and has been engaged in the practice of Obstetrics and Gynecology for 16 years.

80. To reach his opinions, Dr. James reviewed Ileana's records kept by Dr. Castillo and the Hospital's records from her admission at the Hospital for her delivery.

81. Dr. James also reviewed the death certificate and witness depositions, other experts' reports and the Hospital's protocols.

82. According to Dr. James, several deviations from the standard of care by the various physicians, the nursing staff employed by the Hospital, doctor staff, as well as the Hospital itself resulted in the medical complications that eventually resulted in Ileana's death.

83. According to Dr. James, Doctor Fuentes was the last physician involved in Ileana's care that had the opportunity to save her life. However, because of inaction, delay in evaluating and treating Ileana, and failure to use the appropriate treatments, Dr. Fuentes unfortunately allowed Ileana to pass.

84. Patients who lose a lot of blood usually undergo a process called consumptive coagulopathy. This means that they use up their clotting factors and continue to bleed.

85. Consumptive coagulopathy results in Disseminated Intravascular Coagulopathy where the body has a difficult time clotting blood. This condition can be addressed by transfusing clotting factors.

86.   The requests for blood transfusions sent to the Hospital's Blood Bank indicate that only PRBCs were requested.

87.   The blood bank's request for blood transfusion forms indicate that platelets, plasma, and other products could be requested.

88.   Blood products such as Fresh Frozen Plasma (FFP) and cryoprecipitate contain clotting factors, which according to the Hospital's hemorrhage plan, should have been transfused to Ileana to help stem the bleeding.

89.   Hospitals routinely have plans and/or protocols that recognize the need to transfuse clotting factors in addition to packed red blood cells when hemorrhaging occurs.

90.   When Ileana was transferred to the ICU, Dr. Fuentes should have transfused the appropriate ratios of blood products that would have not only replaced lost blood volume, but also helped stem further bleeding by replacing clotting factors.

91.   According to Dr. James, if Dr. Fuentes had done the appropriate and timely evaluation and treatment, Ileana had a very high likelihood of surviving.

92.   As Ileana's obstetrician and gynecologist, who also delivered her first child, Dr. Castillo was aware of her medical conditions and thus knew that she was a high-risk patient due to being diagnosed with high blood pressure, gestational diabetes and obesity.

93.  Despite scheduling Ileana's induction of labor for a specific date in advance, Dr. Castillo did not coordinate to be present at her delivery or, in the alternative, arrange for another obstetrician to provide coverage in case of an emergency.

94.  Even after the nursing staff called for Dr. Castillo once Ileana was 8 to 9 cm dilated, he was not readily available for over an hour nor did he successfully coordinate for another obstetrician to go in his place.

95.  This led to Ileana going in to labor without the benefit of having an obstetrician present, even though she was a high-risk patient.

96.  Dr. Castillo's notes also show that he erroneously recorded Ileana's estimated blood loss during birth as 500 milliliters. According to Dr. James, although 500 milliliters is the average blood loss during pregnancy, this is incompatible with the multiple notes throughout the medical record reiterating Ileana's profuse bleeding.

97.  Dr. Rivera evaluated and treated Ileana for approximately half an hour before Dr. Castillo was able to evaluate her.

98.  During this time, Dr. Rivera ordered that Ileana be administered Methergine, 0.2 milligrams intramuscularly. Despite being the correct dosage, this medication is generally not indicated for hypertensive patients.

99. Nevertheless, in his testimony, Dr. James indicated that this was not a factor that led to Ileana's death.

100. Dr. Marrero transferred Ileana to the ICU when she was unstable, tachycardic and hypertensive. However, Dr. Marrero's note indicates that Ileana was to be transferred to the ICU in critical condition, intubated and ventilated.

101. The Hospital, and specifically its nursing staff, did not follow the established protocols regarding post-partum hemorrhaging. Specifically, no member of the Hospital's staff requested or recommended that Ileana receive blood clotting factors.

102. The detailed hospital records reflect that during Ileana's labor, the nursing staff only called Dr. Castillo once, at 3:20 p.m., to inform him that Ileana became dilated 8 to 9 cm. The nurses did not call Dr. Castillo again to notify that Ileana needed urgent medical assistance.

103. The records also show that the nurses treating Ileana did call Mrs. Figueroa, their supervisor, and eventually Dr. Rivera, an emergency room physician. However, considering Ileana's profuse bleeding, calling another obstetrician or surgeon for assistance was the proper course of action.

104. Likewise, when Ileana was being transferred from the Operating Room to the Intensive Care Unit, there is no note in the

record describing the nursing staff calling Dr. Fuentes and informing him of Ileana's need for immediate medical attention.

**E. As to plaintiff Josue Laboy-Acosta's Damages:**

105. Mr. Laboy-Acosta is Ileana's brother. He is nine (9) months older than Ileana and married. His oldest son is four (4) months older than Ileana's oldest son Dylan.

106. Ileana was his trusted confidant and counselor to the extent that he talked to her about matters he felt he could not share with his wife.

107. Though Mr. Laboy-Acosta moved to Gillette, Wyoming for work-related reasons in 2012, his relationship with Ileana did not change. They continued to keep in touch by telephone and met during Josue's vacations.

108. One of those vacations took them and their families to Colorado and South Dakota.

109. Mr. Laboy-Acosta feels that he cannot visit these places anymore because of the association with Ileana.

110. Mr. Laboy-Acosta did not testify about any ongoing medical or psychological treatment.

**F.   As to Plaintiff Maria Ines Acosta-Irizarry Damages:**

111. Mrs. Acosta described Ileana as an exceptional daughter and mother. She was attentive to detail, kind and made sure the family stayed together by organizing gatherings.

112. Mrs. Acosta also described Ileana as an exceptional student. Mrs. Acosta postponed completion of her college studies for various circumstances and eventually graduated with Ileana from the University of Puerto Rico's Aguadilla Campus in 2010.

113. Mrs. Acosta was at the Hospital when Ileana was taken into surgery and when she left the operating room. Mrs. Acosta was informed that Ileana was going to be taken to the ICU, instead of a hospital room, and received an update on her daughter's medical condition.

114. Mrs. Acosta was at the Hospital when her daughter died. She received the news of Ileana's passing from Dr. Castillo.

115. Mrs. Acosta felt she would go mad after Ileana's death and she sought the aid of a psychologist in Puerto Rico prior to her daughter's funeral.

116. After Ileana's death, every time she sees a young pregnant woman she experiences fear and anxiety.

117. Following Ileana's untimely death, Mr. Laboy and Mrs. Acosta had to resort to mediation to enforce their right to visit Ileana's children because Zuriel would cancel commitments and not allow them to visit the children.

118. Zuriel is now in a relationship with another woman. While she understands that Ileana's husband is a young man and it was inevitable that he would move on, it is painful for Mrs. Acosta

Irizarry to know that he is in a new relationship and that Ileana's two young sons call Zuriel's new romantic partner "mom".

119. When she moved to Wyoming, Mrs. Acosta sought the services of a psychologist there.

120. Mrs. Acosta visits the psychologist in Wyoming every three weeks. She does not want to burden her husband or children with her sadness and thus she shares her feelings with the psychologist and not with them.

**G. As to plaintiff Ramon Laboy-Irizarry:**

121. Mr. Laboy described Ileana in the same terms as his wife. To him, Ileana was the spark of life at family gatherings.

122. Mr. Laboy also had a close relationship with Ileana. He would pick up Ileana's oldest son from school to help her.

123. At the time of Ileana's death, Mr. Laboy was at the Puerto Rico Medical Center in Rio Piedras, Puerto Rico, accompanying and supporting Ileana's husband as new-born Elian had been transferred to the Intensive Care Unit there for treatment.

124. He made it back to Aguadilla to see his daughter's corpse at the Hospital. On the way to Aguadilla from Rio Piedras, it fell upon him to break the news of Ileana's passing to Ileana's husband, Zuriel. Zuriel did not want to see Ileana's corpse.

125. Following Ileana's death, Mr. Laboy and his wife went to Gillette, Wyoming to assist their son Josue and his wife with the

birth of their second child. They returned to Puerto Rico to assist their youngest daughter who was also pregnant.

126. He and his wife moved permanently to Wyoming after Ileana's death because they began to experience "a lot of anguish" when they started to realize that Ileana was no longer with them.

127. Every time he sees a young pregnant woman he also experiences fear.

128. Mr. Laboy was diagnosed with bipolar disorder in 2006.

129. He takes the three (3) medications to manage his condition: Lithium, Zyprexa and Lamotrigine.

130. After Ileana's death, his lithium dosage was increased from 1,800 to 2,000 milligrams a day. He was also instructed to take an extra dose of 300 milligrams of lithium if he experiences depression, anxiety or sleeplessness.

131. He also had to increase the frequency of his visits to the VA Clinic for treatment of his bipolar depression. Prior to Ileana's death, he had a standing appointment once every quarter. Now, he visits the VA Clinic every two months.

132. Despite Ileana's death, he has been able to avoid hospitalization for bipolar depression for 11 years.

### III. CONCLUSIONS OF LAW

**A. Default Hearing Under Fed. R. Civ. P. 55(b):**

Fed. R. Civ. P. 55(b) provides in turn that when judgment is not for a sum certain, the Court "may conduct hearings or make

referrals—preserving any federal statutory right to a jury trial
[…] (B) to determine the amount of damages; (C) the truth of any
allegation by evidence; or (D) investigate any other matter." 
This Rule "preserves the trial by jury when and as required by any
statute of the United States." <u>Henry v. Sneiders</u>, 490 F.2d 315,
317 (9th Cir. 1974), cert. denied 419 U.S. 832 (1974) (quotations
omitted). *See also* Wright, Miller & Kane Federal Practice &
Procedure: Civil 3d § 2688 (2019). The only federal statute
providing for a jury trial that the Court is aware of is
inapplicable in this case. *See* 28 U.S.C. § 1874 (actions on bonds
and specialties). Moreover, there is no constitutional right to a
jury trial upon entry of default "since **the Seventh Amendment right
to trial by jury does not survive a default judgment**." <u>Henry v.
Sneiders</u>, <u>490 F.2d at 318.</u> *See also* <u>Adriana Inter. Corp. v.
Thoeren</u>, 913 F.2d 1406, 1414 (9th Cir. 1990); <u>Eisler v. Stritzler</u>,
535 F.2d 148, (1st Cir. 1976) ("Since plaintiffs' claims were not
for unliquidated damages and defendant had made an appearance, a
hearing, although not a jury trial was required.")

"After an entry of default, a court may examine a plaintiff's
complaint to determine whether it alleges a cause of action. In
making that determination **it must assume that all well pleaded
factual allegations are true**." <u>Quirindongo Pacheco v. Rolon
Morales</u>, 953 F.2d 15, 16 (1st Cir. 1992) (citations omitted).

Pursuant to Fed. R. Civ. P. 55(b)(2), a court, in an exercise of its discretion, "may hold a hearing to establish the truth of any averment in the complaint." Id. (internal quotations omitted). The First Circuit has held that before holding such a hearing, the Court must provide adequate notice and make its requirements known to plaintiff. Id. (citing McGinty v. Berenger Volkswagen, Inc., 633 F.2d 226, 229 (1st Cir.1980)).

The Court complied with this notice requirement by directing Plaintiffs to present evidence of their damages and evidence as to the co-defendants' liability in order to be in position to apportion it.

**B. Medical Malpractice under Puerto Rico Law:**

Puerto Rico's General Tort Statute Article 1802 of the Puerto Rico Civil Code provides that "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." P.R. Laws Ann. tit. 31, § 5141 (1991).

To prove medical malpractice in Puerto Rico, a plaintiff must establish: "(1) the duty owed (*i.e.*, the minimum standard of professional knowledge and skill required in the relevant circumstances), (2) an act or omission transgressing that duty, and (3) a sufficient causal nexus between the breach and the claimed harm." Torres-Lazarini v. United States, 523 F.3d 69, 72 (1st Cir. 2008) (quoting Cortés-Irizarry v. Corporacion Insular De

*Seguros*, 111 F.3d 184, 189 (1st Cir. 1997)).

1. *As to the duty owed*:

According to the First Circuit, "[t]he general parameters of the duty of care that a physician owes to a patient under Puerto Rico law are uncontroversial." Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1,7 (2010). Specifically, physicians practicing in Puerto Rico "must employ a level of care consistent with that set by the medical profession nationally." Id. (citing Cortés-Irizarry, 111 F.3d at 190.)

Under Puerto Rico law, there exists a presumption that physicians have "provided an appropriate level of care." Id. Thus, plaintiffs have the "obligation to refute this presumption by adducing evidence sufficient to **show both the minimum standard of care required and the physician's failure to achieve it**." Id.

Ordinarily, expert testimony is required to prove the applicable standard of care **and** the doctor's failure to meet it "[b]ecause medical knowledge and training are critical to demonstrating the parameters of a health-care provider's duty, the minimum standard of acceptable care is almost always a matter of informed opinion." Rolon-Alvarado v. Municipality of San Juan, 1 F.3d 74, 78 (1st Cir. 1993). *See also* Santiago v. Hospital Cayetano, Coll y Toste, 260 F.Supp. 2d 373 (D.P.R. 2003).

Turning to hospitals, they may be held liable: (a) when the hospital's employees, medical staff, or agents have acted

negligently; (b) for the negligent acts of a physician who was granted the privilege of using the hospital's facilities for their private patients; and (c) when a patient comes to a hospital in search of help and they believe, or are given the impression, that all the medical staff treating them is employed by the hospital, regardless of whether or not it is true. *See* Casillas Sanchez v. Ryder Memorial Hospital, Inc., 960 F.Supp. 2d 362, 365 (D.P.R. 2013)(citing Marquez Vega v. Martinez Rosado, 16 P.R. Offic. Trans. 487 (1985)).

2. *As to causation*:

Pursuant to Puerto Rico law, causation is judged by the "adequate cause" doctrine. The adequate cause "is not every condition without which a result would not have been produced, but that which ordinarily produces it according to general experience." Cardenas Maxan v. Rodriguez Rodriguez, 125 P.R. Dec. 702, 710 (1990), P.R. Offic. Trans. *See* Ganapolsky v. Boston Mut. Life Inc. Co., 138 F.3d 446, 443 (1st Cir. 1998) ("A condition is an adequate cause if it ordinarily can be expected to produce the result at issue.")

To establish causation under Puerto Rico law, plaintiffs "must prove, by a preponderance of the evidence, that the physician's negligent conduct was the factor that 'most probably' caused harm to the plaintiff." Marcano Rivera v. Turabo Medical Center Partnership, 415 F.3d 162. 168 (1st Cir. 2005) (quoting

Civil No. 17-1362 (RAM)                                                          25

Lama v. Borras, 16 F.3d 473, 478 (1st Cir. 1994)).

Although this causation standard "does not require all other causes of damage to be eliminated [...] expert testimony is generally essential." Id. This is due to the need to "clarify complicated medical issues that are more prevalent in medical malpractice cases than in standard negligence cases." Pages-Ramirez v. Hosp. Espanol Auxilio Mutuo De Puerto Rico, Inc., 547 F. Supp. 2d 141, 149 (D.P.R. 2008) (citing Otero v. United States, 428 F.Supp.2d 34, 45-46 (D.P.R.2006)).

3. *The case at bar*:

Pursuant to Fed. R. Civ. P. 55(b), the Court heard expert testimony relevant to plaintiffs' allegations of malpractice against Dr. Fuentes and the settling co-defendants.

Based on his testimony and his Curriculum Vitae, the Court found that Dr. Jason S. James was qualified to testify as an expert in Gynecology & Obstetrics because he possessed the requisite knowledge, skill, experience, training, and education.[1] *See* Fed. R. Evid. 702.

Based upon Plaintiffs' expert's **unopposed** expert testimony which the Court finds credible, the Hospital and the doctors breached the standard of care and those breaches were the adequate cause of Ms. Ileana Laboy-Irizarry's death on May 31, 2016.

---

[1] It is worth noting that none of the settling defendants presented a motion *in limine* questioning the admissibility of Dr. James' testimony.

In general terms, Dr. Fuentes, Dr. Castillo, Dr. Marrero, and the Hospital's staff all breached the applicable standard of care by deviating from the Hospital's post-partum hemorrhaging protocols. In summary, Dr. Fuentes did not timely evaluate Ileana when she was transferred to the ICU in critical condition and failed to transfuse clotting factors in addition to blood to control her profuse blood loss. Dr. Castillo did not recognize that Ileana was a high-risk patient that required his attention, or that of another obstetrician, and failed to plan accordingly. Dr. Marrero transferred Ileana to the ICU while she was still unstable. Lastly, the Hospital's nursing staff repeatedly failed to adequately communicate Ileana's dire condition to various doctors and they did not contact another obstetrician when Dr. Castillo was not available. On the other hand, the Court finds that Dr. Rivera did not incur in medical malpractice given the limited scope of the treatment he provided to Ileana. Furthermore, pursuant to Plaintiffs' own expert testimony, the fact that he ordered Ileana be administered Methergine did not contribute to her death.

### C. Apportionment of liability:

In Puerto Rico, when more than one person's tortious acts and/or omissions have caused a harm, "each of the tortfeasors is solidarily liable to the plaintiff for the harm done." *See* Ortiz v. Cybex, 345 F.Supp. 3d 107, 122 (D.P.R. 2018) (citing Tokyo

Marine and Fire Ins. Co., Ltd. v. Pérez & Cía., de Puerto Rico, Inc., 142 F.3d 1, 8 (1st Cir. 1998)). "However, solidarity does not presuppose that the scope or source of liability is identical for each solidary debtor." Tokyo Marine and Fire Ins. Co., Ltd., 142 F.3d 1,6 (1st Cir. 1998). Moreover, "solidary debtors may be obligated to different degrees." Id. Likewise, the Puerto Rico Supreme Court has held that "joint tortfeasors are solidarily liable to the injured party, but **the onerous effect between the joint tortfeasors should be distributed in proportion to their respective degree of negligence**." Szendrey v. Hospicare, Inc., 158 P.R. Dec. 648 (2003), P.R. Offic. Trans.

Courts in Puerto Rico are generally guided by "the principle that no one should or may unjustly enrich himself by receiving double compensation for the same accident." Villarini-Garcia v. Hosp. del Maestro, 112 F.3d 5, 8 (1st Cir. 1997) (quotations omitted). Thus, when a plaintiff liberates a settling tortfeasor from all liability **and** the court determines said settling tortfeasor's share of the responsibility, the non-settling tortfeasors are entitled to an offset. *See* Gomez v. Rodriguez-Wilson, 819 F.3d 18, 22 (1st Cir. 2016). In other words, because non-settling tortfeasors may not seek contribution against any liberated settling tortfeasor, "a proportionate setoff in which the portion of responsibility attributed to the settling tortfeasor is deducted from an award against the non-settling

tortfeasor is proper in order to prevent unjust enrichment." Id.
at n. 4. It is worth noting that in the context of joint
tortfeasors, Puerto Rico case law requires proportional offsets
over dollar-for-dollar setoffs. *See* Rio Mar Assocs., LP, SE v. UHS
of Puerto Rico, Inc., 522 F.3d 159, 165-167 (1st Cir. 2008) (citing
Szendrey v. Hospicare, 158 P.R. Dec. 648 (2003). *See also* Gomez,
819 F.3d at 22-23 (1st Cir. 2016) (citing Sagardía de Jesús v.
Hosp. Auxilio Mutuo, 177 P.R. Dec. 484 (2009)).

     As a prerequisite for a proportionate offset, plaintiffs
and/or non-settling defendants must present evidence regarding the
settling tortfeasor's degree of responsibility. *See* Gomez, 819
F.3d at 21-23. (Non-settling doctor was held liable for the
entirety of the jury award because he did not ask the jury to
apportion responsibility). With regards to what evidence is needed
to apportion liability, the First Circuit has validated the use of
expert testimony, documents and circumstantial evidence as proof
of negligence. *See* Marcano Rivera, 415 F.3d at 171 (The First
Circuit rejected a hospital's claim that circumstantial evidence
and expert testimony was insufficient evidence to support a jury
finding that it was liable for 47% of the damages).

     Based on plaintiffs' expert's unopposed testimony and
Ileana's medical records that were submitted into evidence, the
Court apportions liability in this case among Dr. Fuentes and the
settling defendants as follows:

A. Hospital Comunitario Buen Samaritano: 50%

B. Dr. Samuel Fuentes: 20%

C. Dr. Ruben Castillo-Rivera: 25%

D. Dr. Jose Marrero-Russe: 5%

E. Dr. Luis Rivera-Rivera: 0%

Because the Court has apportioned liability between the settling co-defendants and Dr. Fuentes, he is entitled to a **proportionate** offset of the settling tortfeasors' liability. In other words, Dr. Fuentes is only liable to plaintiffs for twenty percent (20%) of the total they proved during the Fed. R. Civ. P. 55(b) hearing.

**D. Mental Anguish Damages under Puerto Rico Law:**

In Puerto Rico tort law cases, including medical malpractice, "relatives are entitled to compensation for the sufferings, emotional distress, or mental anguish experienced as a consequence of the material or other damages caused directly to their relatives." Santana-Concepción v. Centro Medico Del Turabo, Inc., 768 F.3d 5, 10 (1st Cir. 2014)(internal quotations omitted).

In evaluating plaintiffs' evidence of damages, the Court was mindful of the following admonitions by the Puerto Rico Supreme Court. First, while the Court acknowledges that "human sorrow and physical pain are not similar or financially assessable", it also finds that "if money does not suffice to redress this type of damage, an insufficient compensation for the victim would be better

than none." <u>Riley v. Rodriguez de Pacheco</u>, 19 P.R. Offic. Trans. 806, 848 (1987). When attempting to measure intangible emotions, it is possible for mental suffering to "be quantified ad infinitum." <u>Id</u>. at 849. However, "[w]ithout reasonable limits, compensation would no longer bear the characteristics of a redress, but would rather become punitive." <u>Id</u>.

Based on the above findings of fact, derived from plaintiffs' **unopposed** testimony, and the applicable law, the Court values plaintiffs' total past, present and future mental anguish damages as follows:

1. Ramon Laboy-Irizarry in the amount of **$250,000**;

2. Maria Ines Acosta-Irizarry in the amount of **$250,000**;

3. Josue Laboy-Irizarry in the amount of **$100,000**.

### IV. ORDER

For the foregoing reasons, the Court awards damages against Dr. Samuel Fuentes as follows:

A. Compensatory damages for the past, present and future mental anguish damages of Ramon Laboy-Irizarry in the amount of **$50,000**;

B. Compensatory damages for the past, present and future mental anguish damages of Maria Ines Acosta-Irizarry in the amount of **$50,000**;

C. **$20,000** for the mental anguish damages of Josue Laboy-Acosta;

D. Plaintiffs are further entitled to attorney's fees, costs and post-judgment interest as prevailing parties, pursuant to Puerto Rico Rules of Civil Procedure 44.1 and 44.3.

Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 17th day of July 2019.

s/Raúl M. Arias-Marxuach   _ _
RAÚL M. ARIAS-MARXUACH
UNITED STATES DISTRICT JUDGE